UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **KATHLEEN GEMMELL**, <br><br> Plaintiff, <br><br> v. <br><br> **ENCOMPASS INDEMNITY COMPANY**, <br><br> Defendant. | 2:18-cv-11257 <br><br> HON. TERRENCE G. BERG <br><br><br> **ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

Plaintiff Kathleen Gemmell seeks recovery from her insurance company, Defendant Encompass Indemnity Company, for injuries she says she sustained when the suspension fell out of her car while she was driving in Madison Heights, Michigan. She is suing, under Michigan's No-Fault Act, Mich. Comp. Laws § 500.3101 *et seq.*, for personal protection insurance ("PIP") benefits to pay medical bills, lost wages, attendant care benefits, and other expenses she and her husband incurred because of the accident. Encompass in turn contends that in order to obtain no-fault benefits Plaintiff made material misrepresentations regarding the nature and cause of her injuries, as well as attendant care and replacement services purportedly performed by her husband, Gary Gemmell. According to Encompass, these alleged misrepresentations trigger a fraud exclusion in the insurance policy,

releasing Encompass from any obligation to pay Plaintiff's claims. The parties are now before the Court on Encompass's motion for summary judgment. Based on evidence presented in the parties' briefs and during the parties' June 17, 2019 oral arguments in this matter, the Court has determined that genuine disputes of material fact remain, making summary judgment inappropriate at this time.

## BACKGROUND

Encompass issued policy number 281976536 to Gary Gemmell and Kathleen Gemmell. That policy, which was in effect from June 22, 2017 through June 22, 2018, provided home insurance, car insurance, and personal umbrella coverage to Plaintiff and her husband. It also contained several coverage exclusions including one titled "Concealment or Fraud," which placed the following limitation on coverage: "[t]his insurance is based on your honest cooperation with us, so the information you gave to us must be correct to the best of your knowledge. Therefore:

- (a) . . . we do not provide coverage to one or more covered persons, who whether before or after a loss, has:
    - (1) Concealed or misrepresented any material fact or circumstance; or
    - (2) Engaged in fraudulent conduct; or
    - (3) Made false statements relating to his insurance; whether as to eligibility or claim entitlement.

ECF No. 19-10 PageID.315.

2

Plaintiff is a 63-year-old home-healthcare attendant. She claims that the single-car accident caused "[a]ggravation of existing pelvis fracture, addition of new pelvis fractures, back pain, head injury, anxiety, neck pain," and a "new fracture in [her] low back," rendering her unable to work from September 22, 2017 through February 27, 2018. ECF No. 19-11 PageID.400–01; ECF No. 21-1 PageID.501. At the time of the accident Plaintiff had, for several years, worked as a caregiver to her mother's elderly friend, who Plaintiff calls her "aunt." ECF No. 19-1 PageID.104 (Plaintiff's Dep.). She was paid for these services through her aunt's trust, the Sylvia Higison Trust, at a rate of $17 per hour. ECF No. 19-1 PageID.105; ECF No. 19-11 PageID.397. Plaintiff's husband happens to be the trustee of the Sylvia Higison Trust. ECF No. 19-11 PageID.397.

In addition to the physical injuries she claims to have sustained in the car accident, Plaintiff avers that the debilitating nature of her injuries necessitated that her husband provide attendant care and replacement services for her each day from September 22, 2017, the day after the accident, through December 31, 2017. ECF No. 19-11 PageID.390–92; ECF No. 21-1 PageID.552–55. The claimed attendant care services included "bathing, lifting, fetching, carrying, cooking, and performance of activities for patient that avoid any prolonged standing or use of staircase." ECF No. 19-11 PageID.379–390. Plaintiff's husband signed a sworn statement attesting that he performed these services for

at least four hours each day. ECF No. 19-11 PageID.391; ECF No. 21-1 PageID.555. He also stated that he spent at least 2.5 hours each day during this same September 22, 2017 through December 31, 2017 period performing replacement services. ECF No. 19-11 PageID.411; ECF No. 21-1 PageID.531–34. These replacement services, which were compensable at a rate of $20 per day under the policy, included washing dishes, cleaning, preparing meals, taking out the garbage, gardening, and picking fruits and vegetables. ECF No. 19-11 PageID.402.

Encompass contends Plaintiff's claimed injuries in fact predate the car accident and that she fraudulently attributed them to the accident to obtain no-fault benefits. Encompass further questions Plaintiff's assertion that her husband performed extensive attendant and replacement services in the wake of the accident. To cast doubt on the veracity of her claims for these services, Encompass highlights Plaintiff's statements to medical providers suggesting that she and her husband were not living together, or at least were not on amicable terms, during the months he supposedly provided these services.

The central question before the Court at this juncture is whether the undisputed material facts show that Plaintiff's actions implicate the fraud exclusion in her insurance policy and, if so, whether violation of that exclusion as a matter of law precludes Plaintiff's claim for PIP benefits.

4

# DISCUSSION

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The moving party has the initial burden of demonstrating an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party carries this burden, the party opposing the motion "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). On a motion for summary judgment, the Court must view the evidence and any reasonable inferences drawn from the evidence in the light most favorable to the non-moving party. *Matsushita*, 475 U.S. at 587 (citations omitted); *Redding v. St. Edward*, 241 F.3d 530, 531 (6th Cir. 2001). The trial court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989). Rather, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001). The Court must then determine whether the evidence presents a sufficient factual

disagreement to require submission of the challenged claims to the trier of fact or whether the moving party must prevail as a matter of law. *See Anderson*, 477 U.S. at 252.

The Michigan Supreme Court has acknowledged that insurance policies are contracts and therefore, in the absence of an applicable statute, are 'subject to the same contract construction principles that apply to any other species of contract.'" *Titan Ins. Co. v. Hyten*, 817 N.W.2d 562, 567 (Mich. 2012) (quoting *Rory v. Cont'l Ins. Co.*, 703 N.W.2d 23, 26 (Mich. 2005)). An insurance policy's language should be "read as a whole" and the language construed "to give effect to every word clause, and phrase." *Bahri v. IDS Prop. Cas. Ins. Co.*, 864 N.W.2d 609, 612 (Mich. 2014) (per curiam) (citing *McGrath v. Allstate Ins. Co.*, 802 N.W.2d 619, 621 (Mich. App. 2010)). When policy language is clear, "a court must enforce the specific language of the contract." *Bahri*, 802 N.W.2d at 621–22 (citing *Heniser v. Frankenmuth Mut. Ins. Co.*, 534 N.W.2d 502 (Mich. 1995)). A clear and specific exclusion of coverage "will be enforced as written so that the insurance company is not held liable for a risk it did not assume." *Auto Owners Ins. Co. v. Seils*, 871 N.W.2d 530, 539 (Mich. App. 2015) (citing *Auto-Owners Ins. Co. v. Churchman*, 489 N.W.2d 431, 434 (Mich. 1992)).

Because, in Michigan, "[r]eliance on an exclusionary clause in an insurance policy is an affirmative defense . . . defendant has the burden of proof." *Shelton v. Auto-Owners Ins. Co.*, 899 N.W.2d 744, 749 (Mich.

App. 2017). Accordingly, to obtain summary judgment on the basis of a coverage exclusion, the insurer must establish that there is no genuine dispute of material fact regarding any of the elements of the affirmative defense. The elements of the affirmative defense of fraud, as set forth in *Bahri*, are as follows: "To void a policy because the insured willfully misrepresented a material fact, an insurer must show that (1) the misrepresentation was material, (2) that it was false, (3) that the insured knew that it was false at the time it was made or that it was made recklessly, without any knowledge of its truth, and (4) that the insured made the material misrepresentation with the intention that the insurer would act upon it. A statement is material if it is reasonably relevant to the insurer's investigation of a claim." 864 N.W.2d at 612 (quoting *Mina v. Gen. Star Indem. Co.*, 555 N.W.2d 1, 5 (Mich. 1996), *rev'd in part on other grounds* 568 N.W.2d 80 (Mich. 1997)). The insurer must prove these elements by a preponderance of the evidence. *Stein v. Home-Owners Ins. Co.*, 843 N.W.2d 780, 784 (Mich. App. 2013) ("[T]he only contract cases involving the burden of proving some element by clear and convincing evidence have dealt with oral contracts, avoiding contracts, modifying existing contracts, waiving an existing contractual term, and reforming contracts.").

### A. Plaintiff's inconsistent statements to physicians and to Encompass regarding the cause of her physical injuries.

Plaintiff's extensive medical history makes it difficult to parse whether she has in fact knowingly or recklessly made any misrepresentations to Encompass about the cause of her injuries that would permit Defendant to deny coverage. In May 2017, approximately four months before the car accident at issue, Plaintiff suffered multiple pelvic fractures that required her to use a walker for at least three months. *See* ECF No. 19-7 PageID.140. Two months after sustaining the fractures, she told a medical provider that she was continuing to experience groin, left-hip and pelvic pain. ECF No. 19-7 PageID.140–41. She also confided in a psychiatrist that she was "very anxious that something had fractured in her spine due to osteoporosis." ECF No. 19-6 PageID.132–33. Next, during an appointment at Beaumont Health Center five weeks before the car accident, Plaintiff told her physical therapist that she had recently fallen down three stairs and was experiencing significant pain her left hip, ankles, pelvis, and low back. ECF No. 19-3 PageID.113. Medical records dated August 18, 2017, a month before the car accident, reiterate that Plaintiff's injuries "to the left hip, left thigh, left knee and left lower leg . . . . resulted from a fall" she had experienced the week before." ECF No. 19-8 PageID.227. A week later, Plaintiff told her physical therapist that she had just been diagnosed with a pelvic fracture. ECF No. 19-3 PageID.119. Plaintiff also

acknowledged in interrogatory responses that her pre-existing injuries included a "fracture in two areas of [her] pelvis, which were healing well. Back surgery, fibromyalgia, bipolar, degenerative disc disease, thoracic 2 herniated discs, [and] Arthritis throughout [her] body." ECF No. 21-1 PageID.495.

Plaintiff's car accident did not occur until September 21, 2017. The record is clear that she had several serious injuries that predate the accident, including pelvic fractures. From photos of the September 2017 car accident, it appears Plaintiff's vehicle did not hit any other car or object; she also confirmed the airbags did not deploy. *See* ECF No. 21-1 PageID.469–74, 476. Additionally, Plaintiff did not seek medical care immediately following the accident. But eleven days later, on October 2, 2017, she went to Royal Oak Hospital complaining of worsening pain in her low back and pelvic region, and other issues. *See* ECF No. 19-4 PageID.126–27; ECF No. 21-1 PageID.459. The day she was admitted, one medical provider summarized Plaintiff's medical history as "61 year old female with a history of multiple falls (01/17, 02/17, 05/17), MVA [motor vehicle accident] (09/17), traumatic brain injury, anxiety, bipolar I, neck pain, sjog[r]ens, fibromyalgia, and pelvic fractures." ECF No. 21-1 PageID.461.

Different treating physicians appear to express inconsistent opinions about whether Plaintiff sustained additional pelvic fractures during or after the 2017 car accident. For example, discharge notes from

9

Plaintiff's four-day stay at Royal Oak Hospital reference her car accident but expressly attribute Plaintiff's "[c]losed nondisplaced fracture of pelvis with routine healing" to a "fall." ECF No. 19-4 PageID.126–27. Consistent with that note, Plaintiff mentioned to her physical therapist during this same hospitalization that she had "fallen down the stairs to her basement on 2 occasions and 'hit her head and still has a big bump from the fall.'" ECF No. 19-5 PageID.129; *see* ECF No. 19-6 PageID.138 (October 5, 2017 notation by Plaintiff's radiologist described her medical history as "[b]ilateral low back pain. Fall."). A treating doctor described his October 3, 2017 examination of Plaintiff as a "subsequent encounter for fracture with delayed healing," rather than a new pelvic fracture. ECF No. 21-1 PageID.464. More specifically, he observed a nondisplaced fracture of the left puboacetabular junction and a nondisplaced left inferior pubic ramus fracture, which he described as "[s]ubacute." ECF No. 21-1 PageID.464. Additionally, doctors comparing October 2, 2017 radiographs of Plaintiff's hip with previous images identified "no evidence of acute fracture or dislocation involving the hips," though they observed "redemonstrations of a healing fracture of the left superior pubic ramus [and] . . . . Redemonstration of a healing left inferior pubic ramus fracture." ECF No. 21-1 PageID.463. Accordingly, these doctors did not expressly identify any new pelvic fracture that could plausibly have resulted from the car accident. But they also made the caveat that "a superimposed acute fracture [of Plaintiff's left inferior pubic ramus] is

10

*difficult to exclude."* ECF No. 21-1 PageID.463 (emphasis added); *see* ECF No. 21-1 PageID.458 (note by medical provider explaining he was "unable to determine if [Plaintiff had suffered an] acute on chronic pelvic fracture" and scheduling "MRI of pelvic for further assessment."). Yet, another doctor who examined Plaintiff during her early October hospitalization relayed in his notes that "Patient had a fall in May and was found to have pubic rami fractures. She was then in a MVA on 9/21 and seen by her outpatient orthopedist on 9/25 and was found to have *new* pelvic fractures as well as worsening of prior fractures." ECF No. 21-1 PageID.448 (emphasis added).

Plaintiff submitted her claim for no-fault benefits to Encompass (Claim No. Z5209831 N9) on October 6, 2017, the same day she was discharged from Royal Oak Hospital. ECF No. 19-11 PageID.400. A few days later, in a discussion with one of her treating physicians, she referred to the car accident as the cause of her injuries. *See* ECF No. 21-1 PageID.476 ("[P]atient . . . presents with complaints due to a motor vehicle accident."). Plaintiff also mentioned the car accident during a December 29, 2017 medical appointment. *See* ECF No. 19-7 PageID.185. Notably, almost one year after her discharge, on October 23, 2018, another of Plaintiff's healthcare providers, this one at Michigan Orthopedic & Spine Surgeons, made a connection between her need for planned lumbar spinal fusion surgery and her car accident. *See* ECF No. 21-1 PageID.489. These later statements by Plaintiff to her medical

11

providers appear consistent with those on her application for no-fault benefits, which attributed aggravation of her existing pelvic fractures, as well as new pelvic fractures, back pain, a head injury, anxiety, and neck pain, to the September 21, 2017 car accident. ECF No. 19-11 PageID.400.

It is apparent from the records that Plaintiff's statements to healthcare providers about the cause of her pelvic fractures, back pain, and other injuries are inconsistent with each other, as are some of the relevant comments by her treating physicians. Having carefully examined the medical records and Plaintiff's statements about her injuries, the Court cannot determine which are true, and which are false. Likewise, the Court does not have evidence before it that clearly shows Plaintiff acted knowingly or recklessly in making false statements, or that she did so with the intent that Encompass would act on those statements. Such determinations should be left to the factfinder. What is plain to the Court, however, is that the material facts regarding the nature and cause of Plaintiff's injuries in dispute. For that reason, summary judgment is not warranted.

### B. Plaintiff's inconsistent statements to her physicians and to Encompass regarding replacement and attendant care services.

Encompass also questions the veracity of Plaintiff's claim that her husband provided attendant care and replacement services following the car accident. Specifically, Encompass points to evidence in the record

suggesting Plaintiff and her husband were not living together during at least some of the time he purportedly performed these services, and that evidence indicating the relationship between the couple was fraught makes it implausible that he actually provided these services. Again, the Court finds there is a genuine issue of fact as to whether Gary Gemmell performed these services and, accordingly, whether Plaintiff made any misrepresentations to her insurer.

Plaintiff's doctor, Jason Talbert, M.D., wrote a note dated October 10, 2017 stating that Plaintiff would be "totally incapacitated" from October 10, 2017 through November 7, 2017 and instructed her to remain "off work + no household work for 4 weeks." ECF No. 21-1 PageID.484. Dr. Talbert also filled out an Attendant Care Disability Certificate stating that he had examined Plaintiff "for injuries sustained in a motor vehicle accident on 9/21/17" and concluded "that as a result of the injuries received in this accident, the aforementioned patient needs some help with all or some of the following: . . . Bathing; Dressing; Ambulation; Styling/combing of hair; Help using the toilet; Driving the patient; Cooking for the patient; Fetching things for the patient; Carrying and lifting things for the patient, Assisting with medication and Supervision for safety reasons" between September 22, 2017 and December 31, 2017. ECF No. 21-1 PageID.485. Dr. Talbert specified that Plaintiff needed help "7 days each week at 4 hours per day." ECF No. 21-1 PageID.485.

13

This note establishes a factual basis in support of Plaintiff's need for attendant care and replacement services.

Assessing whether Plaintiff's husband in fact performed all of the claimed services is a thornier inquiry. Forms submitted by Plaintiff to Encompass as part of her request for no-fault benefits identify Gary Gemmell as the individual who performed attendant care and replacement services for Plaintiff between September 22, 2017 and December 30, 2017. ECF No. 19-11 PageID.379–91; PageID.402–11. Additionally, Plaintiff consistently listed her address as 30526 Woodmont Drive, Madison Heights, Michigan on forms provided to Encompass. ECF No. 19-11 PageID.379, 398–400, 402. She testified during her deposition that this is the address where she and her husband have lived together for the past several years. ECF No. 19-1 PageID.104. She provides this same address for her employer, the Sylvia Higison Living Trust, presumably because that is the address of Trust's trustee (who is also her husband). ECF No. 19-11 PageID.397. Notably, Plaintiff made no express representation in the forms she submitted to Encompass concerning whether she and her husband were then living together. Plaintiff did later acknowledge changing her mailing address to her aunt's address sometime in 2018 but said that was only because "it was more convenient" given that her husband often misplaced her mail at their home address, and she works at her aunt's house almost every day. *Id*.

On the other hand, Plaintiff has made statements to medical providers suggesting she moved out of the home she shared with her husband in late November or early December 2017. She told a healthcare provider on February 14, 2017 that "her husband has been very abusive physically to her over the years, [she] wants to leave him, wants him out of her home." ECF No. 19-8 PageID.222. She also discussed moving in with her aunt as a potential solution to extricate herself from the abusive relationship. ECF No. 19-8 PageID.222. On June 30, 2017, Plaintiff reported to her physical therapist that she was experiencing "financial, sexual, and emotional abuse at home." ECF No. 19-7 PageID.141. At least one of these instances caused the police to come to the couple's house. *Id.* A few months later, on December 1, 2017, during an individual session with a clinical psychologist, Plaintiff reported "better mood, less anxiety and no panic attacks since she moved out of her home 3 days ago and moved in with her aunt." ECF No. 19-6 PageID.136. She also discussed a recent separation from her husband, describing it as "beneficial for her mental health." ECF No. 19-6 PageID.136. That same month, on December 29, 2017, she confided to her physical therapist that she and her husband were "now sep[a]rated," and had been for about a month. ECF No. 19-7 PageID.179, 185; *see* ECF No. 19-6 PageID.226 ("pt moved out of her house and she is currently living with her aunt."). According to her therapist's notes, Plaintiff was still living with her aunt in mid-June 2018. ECF No. 19-9 PageID.231. *But see* ECF No. 21-1 PageID.468

15

(February 2, 2018 medical record stating "PT states that her husband will pick her up from the hospital.").

Further complicating the factual inquiry, Plaintiff on other occasions denied physical abuse by her husband, for example, when asked about her situation by a social worker at Royal Oak Hospital on October 5, 2017. ECF No. 21-1 PageID.462. Critically, during her deposition, Plaintiff also testified that her husband had not recently engaged in any abuse or domestic violence, and that such conflict had last occurred approximately 11 years before. ECF No. 19-1 PageID.108. She also testified that she has consistently lived with her husband and only recently (after the time period relevant to her insurance claim) began staying with her aunt "[h]alf of the time in the week." ECF No. 19-1 PageID.104.

Though Plaintiff told medical providers she had moved out of the home she shared with her husband in December 2017, and some evidence suggests she continued to live separately from her husband through at least June 2018, these statements must be balanced against the fact that she also testified that she has consistently lived with her husband at the Woodmont Avenue address. Though these statements are obviously inconsistent with one another, they are not necessarily incompatible with information in the forms she sent Encompass. Additionally, even were Encompass to prove Plaintiff and her husband were living separately in the months following the accident, that would not preclude the possibility

that Mr. Gemmell could have visited her and performed the claimed services. For these reasons, the Court finds there is a genuine dispute of material fact as to whether Gary Gemmell actually performed the claimed attendant care and replacement services and, accordingly, whether Plaintiff knowingly or recklessly made any false statement to Encompass about performance of these services for the purpose of misleading Encompass.

At bottom, this case is not ripe for summary judgment because material facts are in dispute concerning whether Plaintiff made false statements in the application for no-fault benefits she submitted to Encompass, and whether she knew those statements were false at the time or made them without regard to the truth. Courts interpreting Michigan law have acknowledged that, generally, "[w]hether misrepresentations or false statements void an insurance policy depends upon the intent to defraud and this is a question of fact for the jury." *Sinkfield v. State Farm Ins.*, 580 F. App'x 323 (6th Cir. 2014) (quoting *West v. Farm Bureau Mut. Ins. Co. of Mich.*, 259 N.W.2d 556, 557 (Mich. 1977) (per curiam)). Such is the case here.

## CONCLUSION

For these reasons, Defendant's motion for summary judgment is **DENIED**.

Dated: August 19, 2019
s/Terrence G. Berg
TERRENCE G. BERG
UNITED STATES DISTRICT JUDGE